1

2
Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
3
1871 The Alameda, Suite 425
San Jose, CA 95126
4
Telephone:  (408) 429-6506
pgore@prattattorneys.com

5
Michael Hamilton
6
Provost Umphrey Law Firm, LLP
4205 Hillsboro Pike, Suite 303
7
Nashville, TN 37215

8
Edward Fisher
Provost Umphrey Law Firm
9
490 Park Street
Beaumont, TX 77701
10

*Attorneys for Plaintiff*
11

**IN THE UNITED STATES DISTRICT COURT**
12

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13

**SAN JOSE DIVISION**
14

15
ROBERT  PRATT, individually and on
behalf of all others similarly situated,
16

17
                        Plaintiff,
vs.
18

WHOLE FOORS MARKET
19
CALIFORNIA, INC.; MRS
GOOCH'S NATURAL FOODS
20
MARKET, INC.; WFM-WO, INC.;
and WFM PRIVATE LABEL, L.P.
21

                        Defendants.
22

| | |
|---|---|
| **Case No.** CV 12-05652 EJD | |
| **CLASS ACTION AND REPRESENTATIVE ACTION** | |
| **SECOND AMENDED COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF** | |
| <u>**JURY TRIAL DEMANDED**</u> | |

23
        Plaintiff, through his undersigned attorneys, brings this lawsuit against Defendants Whole

24
Foods Market California, Inc., Mrs. Gooch's Natural Foods Market, Inc., WFM-WO, Inc., and

25
WFM Private Label, L.P., (hereinafter referred to as "Whole Foods" and/or Defendants) as to his

26
own acts, upon personal knowledge, and as to all other matters upon information and belief.

27
**I.     DEFINITIONS**

28
    1.   "Class Period" is November 2, 2008 to the present.

2. "Purchased Products" are the products listed below that were purchased by Plaintiff during the Class Period.

    a.   365 Everyday Value Tomato Ketchup

    b.   365 Everyday Value Organic Ketchup

    c.   365 Everyday Value Apple Cinnamon Instant Oatmeal

    d.   365 Everyday Value Organic Chicken Broth

    e.   365 Everyday Value Cola

    f.   365 Everyday Value Ginger Ale

    g.   365 Everyday Value Root Beer

    h.   Natural Italian Soda in green apple flavor

    i.   Natural Italian Soda in blood orange flavor

## II.   SUMMARY OF THE CASE

3. Plaintiff's case has two distinct facets. First, the "UCL unlawful" part. Plaintiff's first cause of action is brought pursuant to the unlawful prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"). Plaintiff alleges that Defendants package and label the Purchased Products in violation of California's Sherman Law which adopts, incorporates – and is identical – to the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"). These violations (which do not require a finding that the labels are "misleading") render the Purchased Products "misbranded" which is no small thing. Under California law, a food product that is misbranded cannot legally be manufactured, advertised, distributed, held or sold. Misbranded products cannot be legally sold, possessed, have no economic value, and are legally worthless. Indeed, the sale, purchase or possession of misbranded food is a criminal act in California and the FDA even threatens food companies with seizure of misbranded products. This "misbranding" – standing alone without any allegations of deception by Defendants or review of or reliance on the labels by Plaintiff – give rise to Plaintiff's first cause of action under the UCL. To state a claim under the unlawful prong, Plaintiff need only allege that she would not have purchased the product had she known it was misbranded because she would have

1   a product that is illegal to own or possess.

2   4.  Second, the "fraudulent" part. Plaintiff alleges that the illegal statements contained on the

3   labels of the Purchased Products – aside from being unlawful under the Sherman Law –

4   are also misleading, deceptive, unfair and fraudulent. Plaintiff describes these labels and

5   how they are misleading. Plaintiff alleges that prior to purchase she reviewed the illegal

6   statements on the labels on the Purchased Products, reasonably relied in substantial part

7   on the labels, and was thereby deceived, in deciding to purchase these products. Had

8   Plaintiff known the truth about the products there would not have been any purchases.

9   5.  Plaintiff did not know, and had no reason to know, that the Purchased Products were

10   misbranded under the Sherman Law and bore food labeling claims that failed to meet the

11   requirements to make those food labeling claims. Similarly, Plaintiff did not know, and

12   had no reason to know, that Defendants' Purchased Products were false and misleading.

13   **III.   BACKGROUND**

14   6.  Every day, millions of Americans purchase and consume packaged foods. Identical

15   federal and California laws require truthful, accurate information on the labels of

16   packaged foods. This case is about companies that flout those laws. The law is clear:

17   misbranded food cannot legally be manufactured, held, advertised, distributed or sold.

18   Misbranded food has no economic value and is worthless as a matter of law, and

19   purchasers of misbranded food are entitled to a refund of their purchase price.

20   7.  Whole Foods is the largest retailer of natural and organic foods in the United States,

21   Canada and the United Kingdom.

22   8.  Whole Foods' sales revenues for 2011 from the sale of its products topped $10 billion.

23   9.   As part of its overall marketing strategy, Whole Foods has recognized the desire of many

24   of its consumers to eat a healthier diet.  Whole Foods recognizes that naturalness and

25   health claims drive sales, and, therefore, actively promotes the naturalness and health

26   benefits of its products.

27   10. For example, Whole Foods makes the following representations regarding its products:

28

- "People are increasingly embracing healthier lifestyles to improve the quality of their lives and minimize their healthcare costs."

- "As America's healthiest grocery store, we are uniquely positioned to benefit from this major demographic evolution."

- We believe that many customers choose to shop our stores because of their interest in health, nutrition and food safety.  We believe that our customers hold us to higher food safety standards than other supermarkets."

11. Whole Foods actively promotes the purported naturalness and health benefits of the Purchased Products, notwithstanding the fact that such promotion violates California and federal law.

12. For example, the nutrition facts of Whole Foods' 365 Organic Everyday Tomato Ketchup purchased by Plaintiff state that it contains 4 grams of sugar but the ingredient label section fails to list "sugar" as in ingredient. Instead, the label lists "Organic Evaporated Cane Juice" ("ECJ") as an ingredient when such term is not the common or usual name for this ingredient and this ingredient is not a "juice." A product's ingredient list is the only place a consumer can look to determine if "added sugar" as opposed to intrinsic or naturally occurring sugar, has been added as an ingredient.

13. If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled. As described more fully below, Defendants have made, and continue to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels. These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional or other desirable benefit over otherwise similar food products that do not claim such benefits or that fully disclose certain undesirable ingredients. More importantly, these laws recognize that the failure to disclose the presence of risk-increasing nutrients is deceptive because it conveys to consumers the net impression that a food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease

1    or health-related condition.

2    14. Identical federal and California laws regulate the content of labels on packaged food.  The

3    requirements of the federal Food Drug & Cosmetic Act ("FDCA") were adopted by the

4    California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law").

5    California Health & Safety Code § 109875, *et seq*.  Under FDCA section 403(a), food is

6    "misbranded" if "its labeling is false or misleading in any particular," or if it does not

7    contain certain information on its label or its labeling.  21 U.S.C. § 343(a).

8    15. Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term

9    "misleading" is a term of art.  Misbranding reaches not only false claims, but also those

10    claims that might be technically true, but still misleading.  If any one representation in the

11    labeling is misleading, the entire food is misbranded, nor can any other statement in the

12    labeling cure a misleading statement. "Misleading" is judged in reference to "the ignorant,

13    the unthinking and the credulous who, when making a purchase, do not stop to analyze."

14    *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA,

15    it is not necessary to prove that anyone was actually misled.

16    16.  In promoting the naturalness and health benefits of the Purchased Products, Defendants

17    claim to understand the importance of communicating responsibly about its products.

18    Nevertheless, Defendants have made, and continue to make, false and deceptive claims on

19    the Purchased Products in violation of federal and California laws that govern the types of

20    representations that can be made on food labels. In particular, in making their unlawful

21    "evaporated cane juice" claims on the Purchased Products, Defendants have violated

22    ingredient and nutrient content labeling regulations mandated by federal and California

23    law by listing sugar and/or sugar cane syrups as "evaporated cane juice on products that

24    fail to comply with the nutritional requirements for making such claims.  According to the

25    FDA, the term "evaporated cane juice" is not the common or usual name of any type of

26    sweetener, including dried cane syrup. Because cane syrup has a standard of identity

27    defined by regulation in 21 CFR 168.130, the common or usual name for the solid or dried

28    form of cane syrup is "sugar" or "dried cane syrup." According to the FDA, sweeteners

derived from sugar cane syrup should not be listed in the ingredient declaration by names which suggest that the ingredients are juice, such as "evaporated cane juice." The FDA considers such representations to be false and misleading under section 403(a)(1) of the Act (21 U.S.C. 343(a)(1)) because they fail to reveal the basic nature of the food and its characterizing properties (i.e., that the ingredients are sugars or syrups) as required by 21 CFR 102.5. Similarly, 21 CFR 101.60 prohibits the use of the term "no sugar added" on products that are as high in calories as the Defendants' unlawfully labeled products or which contain ingredients that are barred because they are or act as added sugar.

17. By making unlawful "all natural," "natural" and "naturale" claims on the Purchased Products, Defendants have violated labeling regulations mandated by federal and California law, which forbids the use of such labeling if the product contains artificial ingredients, flavorings, coloring, and/or chemical preservatives. Similarly, by claiming their products are free of artificial ingredients, flavorings, coloring, and/or chemical preservatives when they actual contain such components or by failing to describe the functions of such components Defendants have engaged in labeling practices that are unlawful and false and misleading.

18. Defendants have made, and continue to make, unlawful claims on food labels of the Purchased Products that are prohibited by federal and California law, and which render these products misbranded. Under federal and California law, the Purchased Products cannot legally be manufactured, advertised, distributed, held or sold. Defendants' false and misleading labeling practices stem from its marketing strategy. Thus, the violations and misrepresentations are similar across product labels and product lines with numerous products bearing the same exact type of unlawful claims as the unlawfully labeled products purchased by the Plaintiff.

19. Defendants' violations of law include the illegal advertising, marketing, distribution, delivery and sale of the Purchased Products to consumers in California and throughout the United States.

IV.  **PARTIES**

20. Plaintiff, Robert Pratt is a resident of Los Gatos, California who purchased the Purchased Products during the four (4) years prior to the filing of this Complaint (the "Class Period").

21. Whole Foods Market California, Inc. is a California corporation doing business in the State of California and throughout the United States of America.  It can be served with process by serving its registered agent: CT Corporation System, 818 W. 7th St., Los Angeles, CA 90017-3407.

22. WFM-WO, Inc. is a Delaware Corporation, doing business in the State of California and throughout the United States of America.  It can be served with process in California by serving their local registered agent at: CT Corporation System, 818 W. 7th St., Los Angeles, CA 90017-3407.

23. WFM Private Label, L.P. is a Delaware Corporation, doing business in the State of California and throughout the United States of America.  It can be served with process by serving their registered agent: CT Corporation System, 350 N. Saint Paul St., Suite 2900, Dallas, TX 75201-4234.

24. Mrs. Gooch's Natural Foods Markets, Inc. is a Nebraska Corporation, doing business in the State of California and throughout the United States of America.  It can be served with process by serving their registered agent: CT Corporation System, 1024 K St., Lincoln, NE 68508-2851.

25. Defendants are a leading producer and distributor of retail packaged grocery products, including the Purchased Products.  Defendants sell their food products to consumers through its stores throughout the United States under labels such as Whole Foods Market, 365 Organic Everyday Value and 365 Everyday Value.

V.  **JURISDICTION AND VENUE**

26. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and

(3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

27. Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

28. The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendants are authorized to do business in California, have sufficient minimum contacts with California, and otherwise intentionally avail themselves of the markets in California and the United States through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

29. Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendants, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## VI.    FACTUAL ALLEGATIONS

### A.    <u>Identical California And Federal Laws Regulate Food Labeling</u>

30. Food manufacturers are required to comply with identical federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

31. Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." California Health & Safety Code § 110100.

32. In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one

1   or more particulars; are misbranded under California Health & Safety Code § 110665 if

2   their labeling fails to conform to the requirements for nutrient labeling set forth in 21

3   U.S.C. § 343(q) and regulations adopted thereto; are misbranded under California Health

4   & Safety Code § 110670 if their labeling fails to conform with the requirements for

5   nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted

6   thereto; are misbranded under California Health & Safety Code § 110705 if words,

7   statements and other information required by the Sherman Law to appear on their labeling

8   are either missing or not sufficiently conspicuous; are misbranded under California Health

9   & Safety Code § 110725 if the label fails to state the common or usual name of

10   ingredients in a food fabricated of two or more ingredients; are misbranded under

11   California Health & Safety Code § 110735 if they are represented as having special

12   dietary uses but fail to bear labeling that adequately informs consumers of their value for

13   that use; and are misbranded under California Health & Safety Code § 110740 if they

14   contain artificial flavoring, artificial coloring and chemical preservatives but fail to

15   adequately disclose that fact on their labeling.

### B.   FDA Enforcement History

16

17   33. In recent years the FDA has become increasingly concerned that food manufacturers were

18   disregarding food labeling regulations. To address this concern, the FDA elected to take

19   steps to inform the food industry of its concerns and to place the industry on notice that

20   food labeling compliance was an area of enforcement priority.

21   34. In October 2009, the FDA issued a Guidance For Industry: Letter regarding Point Of

22   Purchase Food Labeling ("2009 FOP Guidance"), to address its concerns about front of

23   package labels. The 2009 FOP Guidance advised the food industry:

24   > FDA's research has found that with FOP labeling, people are less likely to
25   > check the Nutrition Facts label on the information panel of foods (usually, the
26   > back or side of the package). It is thus essential that both the criteria and
27   > symbols used in front-of-package and shelf-labeling systems be nutritionally
28   > sound, well-designed to help consumers make informed and healthy food
     > choices, and not be false or misleading. The agency is currently analyzing FOP
     > labels that appear to be misleading. The agency is also looking for symbols that
     > either expressly or by implication are nutrient content claims. We are assessing

the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

35. The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

36. Despite the issuance of the 2009 FOP Guidance, Defendants did not remove the unlawful and misleading food labeling claims from the Purchased Products.

37. On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" ("Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages. Our citizens appreciate that effort, and many use this nutrition information to make food choices. Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States. This need is highlighted by the announcement recently by the First Lady of a coordinated

national campaign to reduce the incidence of obesity among our citizens, particularly our children.

With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs. The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. …

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed.  As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations.  As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990.  Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace.  While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices ….

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole.  In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products.  That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling.  I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

38. In addition to its guidance to industry, the FDA has sent warning letters to industry,

including the Defendants and many of Defendants' peer food manufacturers for the same

1    types of unlawful nutrient content claims described above.

2    39. In these letters dealing with unlawful nutrient content claims the FDA indicated that as a

3    result of the same type of claims utilized by the Defendants, products were in "violation of

4    the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21,

5    Code of Federal Regulations, Part 101 (21 CFR 101)" and were "misbranded within the

6    meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim

7    but does not meet the requirements to make the claim." Similarly, letters such as the one

8    received by the Defendant for unlawful "all natural" claims similar to those at issue here

9    indicated that the products at issue were "misbranded under section 403(a)(1) of the Act"

10    because their labels were "false and misleading."

11    40. The warning letters were hardly isolated as the FDA has issued over 10 other warning

12    letters to other companies for the same type of food labeling claims at issue in this case.

13    41. The FDA stated that the agency not only expected companies that received warning letters

14    to correct their labeling practices but also anticipated that other firms would examine their

15    food labels to ensure that they are in full compliance with food labeling requirements and

16    make changes where necessary. Defendants did not change the labels on the Purchased

17    Products in response to the warning letters sent to other companies.

18    42. Defendants also have ignored the FDA's Guidance for Industry, A Food Labeling Guide

19    which details the FDA's guidance on how to make food labeling claims. Defendants

20    continue to utilize unlawful claims on the labels of the Purchased Products. Despite all

21    warnings, the Purchased Products continue to run afoul of FDA guidance as well as

22    federal and California law.

23    43. Despite the FDA's numerous warnings to industry, Defendants have continued to sell

24    products bearing unlawful food labeling claims without meeting the requirements to make

25    them.

26    44. Plaintiff did not know, and had no reason to know, that the Purchased Products were

27    misbranded and bore food labeling claims despite failing to meet the requirements to

28    make those food labeling claims. Similarly, Plaintiff did not know, and had no reason to

know, that the Purchased Products were misbranded because their labeling was false and misleading.

## VII.   OVERVIEW OF APPLICABLE SHERMAN LAW VIOLATIONS

### A.   Evaporated Cane Juice Claims

45. Defendants label and distribute various products such as the 365 Everyday Value Organic Chicken Broth, 365 Everyday Value Tomato Ketchup and 365 Everyday Value Organic Ketchup bought by the Plaintiff, the labels of which misleadingly list "evaporated cane juice" as an ingredient.  Similarly, the Defendants label and distribute various products such as the 365 Everyday Value Apple Cinnamon Instant Oatmeal bought by the Plaintiff, the labels of which misleadingly list "evaporated cane juice solids" as an ingredient.

46. Defendants unlawfully use the illegal term "Evaporated Cane Juice" on their package labels, instead of the proper term sugar.[1]

47. Defendants use the term ECJ to make their products appear healthier than a product that contains "added sugar" as an ingredient.  This illegal label term is used to increase sales and to charge a premium by making a product seem healthier than it is in reality by making it appear that no sugar has been added as an ingredient to the ECJ containing products.

48. Each of the purchased products at issue in this case are misbranded in the same way in that they list "evaporated cane juice" in the ingredient list and omit the term "sugar" or "syrup" as an added ingredient.

49. The labels of the purchased ECJ containing products are reproduced in Exhibit 1 attached hereto.

---

[1] Plaintiffs allege that the ingredient called "evaporated cane juice" by Defendants was in fact sugar. It is possible, however, that instead of adding crystallized sugar as the ingredient at issue that the Defendants added dried sugar cane syrup as the ingredient as the ingredient at issue. The common and usual name of such a syrup is "dried cane syrup" as detailed in 21 C.F.R. § 168.130. Regardless of whether the ingredient in question was sugar or dried cane syrup, calling the ingredient ECJ is unlawful and violates the same state and federal statutory and regulatory provisions and is contrary to FDA policy and guidance. Moreover, the use of the term ECJ renders the products misbranded and illegal to sell or possess regardless of whether the ECJ refers to sugar or sugar cane syrup. While Plaintiffs allege that the ingredient in question was in fact sugar, the Plaintiffs' allegations that ingredient listed as ECJ was sugar should be read to mean the ingredient listed as ECJ was sugar or, in the alternative, dried cane syrup.

50. Defendants' product labeling fails to accurately identify sugar as an "added ingredient" of products. Rather, the label identifies "Evaporated Cane Juice" as an ingredient, despite the fact that the FDCA requires that the ingredient be called "sugar" or "dried cane syrup." The ingredient is not "juice," but is "sugar" or "syrup." 21 C.F.R. § 101.4 (a)(1) provides "[i]ngredients required to be declared on the label or labeling of a food…shall be listed by common or usual name… ." The common or usual name for an ingredient is the name established by common usage or by regulation." 21 C.F.R. § 102.5. These federal regulations have been adopted by California pursuant to the Sherman Law. As discussed below, ECJ is not the common or usual name of any sweetener as established by common usage or by regulation.

51. Consistent with the common and usual name regulations, the FDA has specifically warned companies not to use the term "Evaporated Cane Juice." The FDA has issued these warnings because a label containing the term ECJ (1) is "false and misleading"; and (2) it is a violation of a number of labeling regulations designed to ensure that manufacturers label their products with the common and usual names of the ingredients they use and accurately describe the ingredients they utilize; and (3) the ingredient in questions is not a juice.

52. According to the FDA's published policy, "evaporated cane juice" is simply a "false and misleading" way of describing sugar, and therefore, it is improper to disguise sugar in a product as a type of "juice."

53. In October of 2009, the FDA issued *Guidance for Industry: Ingredients Declared as Evaporated Cane Juice*, *Draft Guidance*, ("2009 ECJ Guidance") (*emphasis* added) which advised industry that:

> [T]he term "evaporated can juice" has started to appear as an ingredient on food labels, most commonly to declare the presence of sweeteners derived from sugar cane syrup. However, FDA's current policy is that sweeteners derived from sugar cane syrup should not be declared as "evaporated cane juice" because that term falsely suggests that the sweeteners are juice…

> "Juice" is defined by 21 CFR 120.1(a) as "the aqueous liquid expressed or extracted from one or more fruits or vegetables, purees of the edible portions of one or more fruits or vegetables, or any concentrates of such liquid or puree."…

As provided in 21 CFR 101.4(a)(1), "Ingredients required to be declared on the label or labeling of a food… shall be listed by common or usual name…"  The common or usual name for an ingredient is the name established by common usage or by regulation (21 CFR 102.5(d)).  The common or usual name must accurately describe the basic nature of the food or its characterizing properties or ingredients, and may not be "confusingly similar to the name of any other food that is not reasonably encompassed within the same name" (21 CFR 102.5(a))…

Sugar cane products with common or usual names defined by regulation are sugar (21 CFR 101.4(b)(20)) and cane sirup (alternatively spelled "syrup") (21 CFR 168.130). Other sugar cane products have common or usual names established by common usage (e.g., molasses, raw sugar, brown sugar, turbinado sugar, muscovado sugar, and demerara sugar)…

The intent of this draft guidance is to advise the regulated industry of FDA's view that the term "evaporated cane juice" is not the common or usual name of any type of sweetener, including dried can syrup. Because cane syrup has a standard of identity defined by regulation in 21 CFR 168.130, the common or usual name for the solid or dried from of cane syrup is "dried cane syrup."…

Sweeteners derived from sugar cane syrup should not be listed in the ingredient declaration by names which suggest that the ingredients are juice, such as "evaporated cane juice." **FDA considers such representations to be false and misleading** under section 403(a)(1) of the Act (21 U.S.C. 343(a)(1)) because they fail to reveal the basic nature of the food and its characterizing properties (i.e., that the ingredients are sugars or syrups) as required by 21CFR 102.5. Furthermore, sweeteners derived from sugar cane syrup are not juice and should not be included in the percentage juice declaration on the labels of beverages that are represented to contain fruit or vegetable juice (see 21 CFR 101.30). (emphasis added).

http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm181491.html.

54. The FDA's position is clear: labels listing "evaporated cane juice" are "false and misleading." ECJ is an unlawful term because it is not the common or usual name for sugar. The ingredient listed as "evaporated cane juice" on Defendants' labels is really "sucrose" as defined in 21 C.F.R. § 184.1854 which is required to be listed as "sugar". While FDA regulations generally provide that "[t]he name of an ingredient shall be a specific name and not a collective (generic) name," the regulations expressly provide that "[f]or purposes of ingredient labeling, the term *sugar* shall refer to sucrose, which is obtained from sugar cane or sugar beets in accordance with the provisions of 184.1854 of this chapter."  21 C.F.R. § 101.4(b)(20)(emphasis in original). 21 C.F.R. § 184.1854 lists the chemical names and identifies "sucrose", CAS number and structure of sugar/sucrose

(C12 H22 O11, CAS Reg. No. 57-50-11-1, β-D-fructofuranosyl-α-D-glucopyranoside)  as well as its common names (sugar, sucrose, cane sugar, or beet sugar). 21 C.F.R. § 184.1854 also confirms that the definition of sugar/sucrose covers and includes products "obtained by crystallization from sugar cane or sugar beet juice that has been extracted by pressing or diffusion, then clarified and evaporated." The ingredient identified as ECJ meets this definition and is sucrose.  As such, Defendants cannot call their sweetener ingredient "evaporated cane juice," but must call it "sugar" or alternatively, "dried cane syrup" pursuant to FDA regulations.

55. It is well established FDA policy that ingredients must always be declared by their common and usual names.  In its October 2009 *Guidance for Industry: A Food Labeling Guide (6. Ingredient Lists)*, the FDA advises:

Should the common or usual name always be used for ingredients?

**Answer:** Always list the common or usual name for ingredients unless there is a regulation that provides for a different term. For instance, use the term "sugar" instead of the scientific name "sucrose."

"INGREDIENTS: Apples, Sugar, Water, and Spices"

See also section 4 question 3. 21 CFR 101.4(a)

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064880.htm#common.

56. Defendants could easily have complied with the FDA and Sherman Law labeling regulations by simply following the FDA's clear example and listing "sugar" on the ingredient list instead of resorting to the illegal term "evaporated cane juice."

57. When the food industry first approached the FDA in 1999 with the idea of calling sugar "evaporated cane juice," the FDA responded with a guidance letter ("2000 Guidance Letter"), saying that certain sweeteners have "well recognized common or usual name[s]" and the common or usual name of "[t]he product extracted from sugar cane is either 'sugar' [21CFR § 101.4(b)(20) and 184.1854], or 'cane syrup' [21 CFR § 168.130]."  The 2000 Guidance Letter went on to point out to the industry that sweeteners such as the sugar at issue here:

should not be declared in the ingredient declaration by names which suggest that the ingredients are juice, e.g "evaporated _ juice" or "_nectar", or in such a way as to suggest that the ingredients contain no sugar, e.g. "natural extract of _". Such representations are false and misleading and fail to reveal the basic nature of the food and its characterizing properties, i.e. the ingredients are sugar or syrups. They are not juice and we should also point out that it is false and misleading to include any of these sweeteners in the fruit juice percentage declaration on the label. As you know, many of FDA's criminal prosecutions of manufacturers and seizures of fruit juices for economic adulteration have involved precisely these sweeteners being misrepresented in such a way as to mislead consumers.

We are concerned about the potential of these ingredients to be labeled in such a way as to mislead consumers. We trust that the foregoing will be helpful in providing guidance on the appropriate labeling of these ingredients.

58. Since it issued the 2000 Guidance Letter, the FDA has sent out numerous warning letters to food manufacturers putting the food industry on notice that ECJ is not the common or usual name of any sweetener, and that its use on food labels is unlawful. Pursuant to FDA policy, warning letters are issued for violations of regulations that the FDA considers to be "violations of regulatory significance".  The FDA warning letters some of which were issued before 2009 and others after the 2009 ECJ Guidance have all expressly stated that "evaporated cane juice" is not the common or usual name of any type of sweetener and that it is not "juice". FDA has stated that the proper way to declare this ingredient can be found on the FDA website in the 2009 ECJ Guidance.

59. The FDA has not wavered from its position that "evaporated cane juice" is a false and misleading term that violates numerous labeling regulations and misbrands products since it was first set out in 2000. Despite the FDA's  numerous policy statements, warning letters and guidance, including the issuance of the 2009 ECJ Guidance which merely reiterates a position the FDA has taken for at least a full decade, Defendants failed to remove the unlawful term ECJ from their misbranded food products' ingredient lists.

60. Plaintiff and the Class paid a premium price for Defendants' products with the illegal term ECJ listed on their labels. Plaintiff would not have purchased these products had he known the products (1) contained sugar as an added ingredient, and (2) were illegal to sell and possess nor would he have expended the purchase price for products that were worthless due to their illegality.

61. Plaintiff and the Class have been damaged by Defendants' illegal conduct in that they purchased misbranded and worthless products that were illegal to sell or possess.

62. Plaintiff's unlawful ECJ claims are brought pursuant to the unlawful prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 and the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*  Plaintiff alleges that Defendants packaged and labeled the Purchased Products in violation of California's Sherman Law which adopts, incorporates, and is, in all relevant aspects, identical to the federal Food Drug & Cosmetics Act, 21 U.S.C. § 301 *et. seq.* ("FDCA").

63. 21 C.F.R. §§ 101.3, 101.4 and 102.5, which have been adopted by California, prohibit manufacturers from referring to foods by anything other than their common and usual names.[2]

64. 21 C.F.R. § 101.4, which has been adopted by California, prohibits manufacturers from referring to ingredients by anything other than their common and usual names. It specifically specifies in subsection (b)(20) that "[f]or purposes of ingredient labeling, the term sugar shall refer to sucrose, which is obtained from sugar cane or sugar beets in accordance with the provisions of 184.1854 of this chapter." 21 C.F.R. § 101.4(b)(20). 21 C.F.R. § 184.1854 lists the chemical names, CAS number and structure of sugar/sucrose (C12 H22 O11, CAS Reg. No. 57-50-11-1, β-D-fructofuranosyl-α-D-glucopyranoside) as well as its common names (sugar, sucrose, cane sugar, or beet sugar). 21 C.F.R. § 184.1854 also confirms that the definition of sugar/sucrose covers products "obtained by crystallization from sugar cane or sugar beet juice that has been extracted by pressing or diffusion, then clarified and evaporated."

---

[2] Pursuant to 21 C.F.R. §102.5 the common or usual name must accurately describe the basic nature of the food or its characterizing properties or ingredients, and may not be "confusingly similar to the name of any other food that is not reasonably encompassed within the same name" (21 C.F.R. 102.5(a)). Defendants' use of the term ECJ fails this requirement because that term does not accurately describe the basic nature of the food or its characterizing properties or ingredients, and may not be "confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Here the true nature of the ingredient is a type of added sugar added to sweeten food. The characterizing properties of this ingredient were falsely misrepresented as a juice when in fact they were a sugar or syrup. Defendants hid this fact by unlawfully using a confusing name (a type of juice) that is not reasonably encompassed within the same name.

65. The Federal Register makes clear that the definition of sugar/sucrose in 21 C.F.R. § 184.1854 was specifically modified by the FDA to cover sugar/sucrose that was obtained by the evaporation of sugar cane juice stating:

> In addition, the agency notes that the description of sucrose in proposed § 184.1854(a) does not explicitly cover the extraction, by pressing, of sugar cane juice from sugar cane or beet juice from sugar beets and also does not mention the evaporation of the extracted sugar cane juice or beet juice. Therefore, the agency has modified § 184.1854(a) to include "pressing" as a possible extraction procedure and "evaporated" as a step in the refinement of sucrose.

53 F.R. 44862.

66. Defendants have violated the regulatory provisions detailed above by failing to use the common or usual name for sugar as mandated by law. In particular, Defendants used the unlawful term ECJ on its products in violation of numerous federal and state labeling regulations designed to protect consumers from illegal misbranded products in direct violation of express FDA policy as quoted above.

67. Defendants violated 21 C.F.R. §§ 101.4 and 102.5 (adopted and incorporated by reference by Sherman Law § 110100 and Sherman Law § 110725). Sherman Law § 110725 mandates that a product is misbranded if the common and usual ingredient names are not used. Therefore, Defendants violated the UCL's unlawful prong by misbranding its products with ECJ instead of using the term "sugar"; or the alternative term "dried cane syrup."

68. Defendants' act of selling an illegally misbranded product violates Sherman Law § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded. The sale of a misbranded product results in an independent violation of the unlawful prong of the UCL that is separate from any labeling violation.

69. Pursuant to Sherman Law § 110825, the sale of such a misbranded product (*i.e.* one whose label fails to use the common and usual ingredient name as required by law) constitutes a criminal act punishable by up to twelve month in jail.  As a result, the injury to the Class arises from the Defendants illegally selling a product it misbranded, the sale of which is a

criminal act. Plaintiff and the Class have been unlawfully deprived of money in an illegal

transaction that occurred because the Defendants sold them a worthless, illegal product

that could not be legally sold or possessed. Due to the law's prohibition of possession of

such a product, consumers have been unwittingly placed, solely and directly by

Defendants' conduct, in a legal position that no reasonable consumer would choose.

Consumers have thus been directly injured by the Defendants' illegal act of unlawfully

selling them an illegal product. This harm goes beyond mere economic injury.

70. Numerous FDA warning letters, which are issued only for violations of regulatory

significance, have made it clear that the use of the term "evaporated cane juice" is

unlawful because the term does not represent the common or usual name of a food or

ingredient. These warning letters state that foods that bear labels that contain the term

evaporated cane juice are misbranded. Such unlawful conduct by Defendants is actionable

under California law irrespective of any reliance by consumers such as Plaintiff.

71. Under California law, a food product that is misbranded cannot be legally manufactured,

advertised, distributed, possessed or sold. Because these products are illegal to possess,

they have no economic value and are legally worthless. Indeed, the sale or possession of

misbranded food is a criminal act in California. The sale of misbranded products is illegal

under federal law as well, as previously stated, and can result in the seizure of the

misbranded products and imprisonment of those involved. When Plaintiff and the Class

purchase an illegally misbranded product (such as the Purchased Products), there is

causation and injury even absent reliance on the ECJ misrepresentation that misbranded

the product.

72. The unlawful sale of Misbranded food products that are illegal to sell or possess– standing

alone without any allegations of deception by Defendants other than the implicit

misrepresentation that its products are legal to sell or possess, or any review of or reliance

on the particular labeling claims by Plaintiffs – gives rise to Plaintiff's cause of action

under the UCL and the CLRA. In short, Defendants' injury causing unlawful conduct is

the only necessary element needed for UCL liability under the unlawful prong. All

Plaintiff needs to show is that he bought an unlawful product that they would not have otherwise purchased absent the Defendants' failure to disclose the material fact that the product was unlawful to sell or possess. Therefore, this claim does not sound in fraud; instead, it alleges strict liability pursuant to the above cited provisions of the federal law and Sherman Law.

73. The Plaintiff was injured by the loss of the purchase price in an illegal transaction, the illegality of which Plaintiffs were unaware, and which the Defendant had a duty to disclose.  Defendants misled Plaintiff to believe that the purchased products were legal to purchase and possess.  Had Plaintiff known that the products were misbranded, he would not have bought Defendants' products.  Plaintiff relied on the Defendants' explicit ECJ representations.  As a result of such reliance, Plaintiff thought that Defendants' product was preferable to other similar products lacking such statements.  Plaintiff further relied upon the Defendants' implicit representation based on Defendants' material omission of material facts that these products were legal to sell and possess.  Reasonable consumers would be, and were, misled in the same manner as Plaintiff.  Defendants had a duty to disclose the illegality of their misbranded products because (a) they had exclusive knowledge of material facts not known or reasonably accessible to the Plaintiff; and (b) the Defendants actively concealed such material facts from the Plaintiff.  The Defendants had a duty to disclose the information required by the labeling laws discussed herein because of the disclosure requirements contained in those laws. Plaintiff was injured because he was unwittingly placed in legal jeopardy due to the possession of Defendants' illegal and misbranded products.  No reasonable consumer would buy a product that was illegal to sell or possess.

74. Defendants act of selling a misbranded product violates Sherman Law § 110760 (unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded). The sale of a misbranded product results in an independent violation of the unlawful prong that is separate from the labeling violations listed above. When Plaintiff purchased Defendants' misbranded products there was causation and injury even absent

1   reliance on the misrepresentation/omission that misbranded the product. This injury arises

2   from the unlawful sale of an illegal product that is crime to sell and crime to possess.

3   Plaintiff was deprived of money in an illegal sale and given a worthless illegal product in

4   return. In addition, due to the law's prohibition of possession of such a product,

5   consumers have been unwittingly placed by the Defendants' conduct in a legal position

6   that no reasonable consumer would agree to be placed.

7   75. Thus, in this case, where Defendants unlawfully sold products containing the unlawful

8   term ECJ there is 1) a violation of specific labeling regulations and 2) an independent

9   violation of the unlawful prong due to the Defendant's sale of an illegal product that is

10   unlawful to possess. The Plaintiff would not have bought the misbranded food products

11   had he known or had Defendants disclosed the material fact that the misbranded food

12   products were illegal to sell and possess. The Plaintiff was injured by the Defendants'

13   unlawful act of selling them an illegal product that was illegal to sell or possess[3].

14   **B.  Defendants' Use of "Evaporated Cane Juice" as an Ingredient on Its Labels is Fraudulent, Deceptive and "Misleading" Because It Fails to Identify "Added Sugar"**

16   76. The Plaintiff was a health conscious consumer who wished to avoid "added sugars" in the

17   products they purchased. "Added sugar" is a recognized term that has a distinct meaning

18   as described below. The Plaintiff was unaware that the products he was purchasing

19   contained "added sugars" that were *added* as an ingredient into Defendants' products

20   during processing or preparation. While Plaintiff was aware that the products contained

21   some sugars, he believed these sugars were naturally occurring sugars that were

22   found *naturally* in the ingredients. The Plaintiff was unaware that the products they

23   purchased contained "added sugar". The reason that Plaintiff was unaware of this fact was

24   that Defendants utilized the false and misleading term "evaporated cane juice" to identify

25   the *added sugar* it added as an ingredient to its yogurt product. The FDA deems the term

26   "evaporated cane juice" to be "false and misleading" because 1) it "fail[s] to reveal the

27   basic nature of the food and its characterizing properties (*i.e.*, that the ingredients are

28

---

[3] The same analysis applies to the analysis of Defendants' illegal "natural" claims.

sugars or syrups)" and 2) "sweeteners derived from sugar cane syrup are not juice."

77. Plaintiff who scanned the ingredient lists of the Defendants' products for forms of added sugar failed to recognize the term "evaporated cane juice" as a form of added sugar. This is hardly surprising since 1) the FDA considers the term to be false and misleading *because* it fails to reveal that the ingredient is a sugar or a syrup; 2) juice is considered to be a healthy food that does not contain added sugars, 3) most lists of added sugars and sugar aliases do not list evaporated cane juice as an added sugar or sugar alias; and 4) consumer studies confirm that most purchase decisions are made in a fraction of a second and thus the potential for a false and misleading term to mislead is significant. Moreover, as discussed below, the Nutrition Facts listing of total sugars does not allow a consumer to determine if a product has any added sugars. Consumers are only able to determine the presence of added sugars by reading a products ingredient list.  Companies like Defendants that mislabel their sugars in the ingredient list with false and misleading terms frustrate this capability by hiding the added sugar. In addition, the inclusion of words such as "juice" or "cane" into the false and misleading term evaporated cane juice do not mitigate the false and misleading nature of the term and in fact in the case of a word like "juice" actually makes it misleading in the eyes of the FDA since it is an added sugar and not a juice. In contrast, the failure to utilize words like "sugar" or "syrup" to describe the ingredient identified by Defendants as evaporated cane juice is false and misleading because it conceals the fact that the ingredient is in fact an added sugar, namely an added sugar or syrup sweetener.

78. The Plaintiff's desire to avoid added sugars was reasonable. Added sugar is a known health risk that consumers are advised to avoid by the United States government, scientific and educational institutions, and food related companies such as grocery store chains and food manufacturers. All of these entities know and publish: 1) there is a distinction between added sugars and naturally occurring sugars; 2) added sugars have no beneficial nutritional value, contribute only empty calories and have recognized health risks 3) consumers should either eliminate or greatly limit their consumption of added sugars and

foods containing added sugars; 4) it is the <u>ingredient list</u> and <u>not the nutrition facts panel</u> of a food's label that informs consumers of the presence of added sugars; and 5) consumers need to be careful to avoid added sugar that is disguised by another name.

79. The 2010 Dietary Guidelines promulgated by U.S. Department of Health and Human Services and the U.S. Department of Agriculture make clear that 1) there is a distinction between "added sugars" and naturally occurring sugars; 2) consumers should either eliminate or greatly limit their consumption of added sugars and foods containing added sugars; 3) it is the ingredient list and not the nutrition facts portion of a food's label that informs consumers of the presence of "added sugars." Available at:

http://www.health.gov/dietaryguidelines/dga2010/DietaryGuidelines2010.pdf.

80. The 2010 Dietary Guidelines indicate that consumers should "[l]imit calorie intake from … added sugars "and "[c]hoose foods prepared with little or no added sugars." *Id.* It further states: *"[u]se the Nutrition Facts label* to choose …. packaged foods with less total sugars, and *use the ingredients list* to choose foods with little or no added sugars." *Id.*

*These* Guidelines indicate that:

An important underlying principle is the need to control calorie intake to manage body weight and limit the intake of food components that increase the risk of certain chronic diseases. This goal can be achieved by consuming fewer foods that are high in sodium, solid fats, **added sugars**, and refined grains and, for those who drink, consuming alcohol in moderation.
*Id. (emphasis added).*

81. The 2010 Dietary Guidelines also define "added sugars":

**"added sugars**—Sugars, syrups, and other caloric sweeteners that are added to foods during processing, preparation, or consumed separately. Added sugars do not include naturally occurring sugars such as those in fruit or milk. Names for added sugars include: brown sugar, corn sweetener, corn syrup, dextrose, fructose, fruit juice concentrates, glucose, high-fructose corn syrup, honey, invert sugar, lactose, maltose, malt syrup, molasses, raw sugar, turbinado sugar, trehalose, and sucrose".

*Id.*

82. Further, the 2010 Dietary Guidelines make clear that consumers who wish to avoid added sugars must read the ingredient list and cannot rely on the Nutrition Facts line item listing of total sugars:

THE FOOD LABEL: A USEFUL TOOL

"Using the Food Label to Track Calories, Nutrients, and Ingredients" (Appendix 4) provides detailed guidance that can help Americans make healthy food choices.

The Nutrition Facts label provides information on the amount of calories; beneficial nutrients, such as dietary fiber and calcium; as well as the amount of certain food components that should be limited in the diet, including saturated fat, trans fat, cholesterol, and sodium.

**The ingredients list can be used to find out whether a food or beverage contains solid fats, added sugars**, whole grains, and refined grains.

*Id.* (emphasis added).

83. Furthermore, these 2010 Dietary Guidelines confirm that it is the ingredients list and not the Nutrition Facts portion of the label that lets consumers determine whether added sugars are present in a product.  Appendix 4 states:

INGREDIENTS LIST

The ingredients list can be used to find out whether a food or beverage contains synthetic trans fats, solid fats, added sugars, whole grains, and refined grains.

NUTRITION FACTS LABEL
The Nutrition Facts label provides the total amount of sugars (natural and added), but does not list added sugars separately. Natural sugars are found mainly in fruit and milk products. Therefore, for all foods that do not contain any fruit or milk ingredients, the total amount of sugars listed in the Nutrition Facts label approximates the amount of added sugars. For foods that contain fruit or milk products, added sugars can be identified in the ingredients list.

The ingredients list can be used in the same way to identify foods that are high in added sugars. Added sugars that are often used as ingredients are provided in Table A4-2.

84. Table A4-2 of the 2010 Dietary Guidelines lists a number of examples of added ingredients that can be listed as an ingredient in a food product's ingredient list. Table A4-2 states:

Examples of Added Sugars That Can Be Listed as an Ingredient:

Anhydrous dextrose, Lactose, Brown sugar, Malt syrup, Confectioner's powdered sugar, Maltose, Corn syrup, Maple syrup, Corn syrup solids, Molasses, Dextrin Nectars (e.g., peach nectar, pear nectar), Fructose Pancake syrup, High-fructose corn syrup, Raw sugar, Honey Sucrose, Invert sugar, Sugar, and White granulated sugar.

85. The list above does not indicate that ECJ is a form of added sugar. However, the 2010 Dietary Guidelines indicate that while ECJ is not recognized by the FDA as an ingredient name, this added sugar is sometimes listed as an ingredient on the labels of food products stating:

> Other added sugars may be listed as an ingredient but are not recognized by FDA as an ingredient name. These include cane juice, evaporated corn sweetener, fruit juice concentrate, crystal dextrose, glucose, liquid fructose, sugar cane juice, and fruit nectar.

*Id.*

86. Other federal government agencies adopt a similar approach to added sugars. For instance, the National Institute of Health 1) confirms the health risks posed by added sugar, 2) indicates the need to read the ingredient list to find added sugars and 3) utilizes a list that fails to include the false and misleading term evaporated cane juice.

87. The National Institute of Health publishes the following about "added sugar":  Added Sugars

> With both the USDA Food Patterns and the Dietary Approaches to Stop Hypertension (DASH) Eating Plan, added sugars mean more calories without more nutrients. For some people, added sugars can lead to higher levels of fats in the blood, raising their risk of heart disease.
>
> Read the ingredients label to see if the processed food you are eating has added sugar. Key words on the label to look for:
>
> - brown sugar
> - corn sweetener
> - corn syrup
> - dextrose
> - fructose
> - fruit juice concentrate
> - glucose
> - high-fructose corn syrup
> - honey
> - invert sugar
> - lactose
> - maltose
> - malt syrup
> - molasses
> - raw sugar
> - sucrose
> - sugar
> - maple syrup

1    http://www.nia.nih.gov/health/publication/whats-your-plate/solid-fats-added-sugars

2    88. The United States government's approach to added sugars is echoed by other scientific,

3    educational and medical entities. For example, the American Heart Association ("AHA")

4    states the following about "added sugar":

5    There are two types of sugars in American diets: naturally occurring sugars and
     added sugars.

6
     • Naturally occurring sugars are found *naturally* in foods such as fruit
7       (fructose) and milk (lactose).

8    • Added sugars include *any* sugars or caloric sweeteners that are *added* to
        foods or beverages during processing or preparation (such as putting sugar
9       in your coffee or adding sugar to your cereal). Added sugars (or added
        sweeteners) can include natural sugars such as white sugar, brown sugar
10      and honey as well as other caloric sweeteners that are chemically
        manufactured (such as high fructose corn syrup).

11
     http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/Sugars-
12   101_UCM_306024_Article.jsp

13   89. The American Heart Association cautions consumers that the Nutrition Facts panel is not

14   the place to look for "added sugar":

15   **Finding added sugars in food**

16   Unfortunately, you can't tell easily by looking at the nutrition facts panel of a food
     if it contains added sugars. The line for "sugars" includes both added and natural
17   sugars. Naturally occurring sugars are found in milk (lactose) and fruit (fructose).
     Any product that contains milk (such as yogurt, milk or cream) or fruit (fresh,
18   dried) contains some *natural* sugars.

19   Reading the ingredient list on a processed food's label can tell you if the product
     contains added sugars, just not the exact amount if the product also contains
20   natural sugars.

21   Names for added sugars on labels include:

22   • Brown sugar
     • Corn sweetener
23   • Corn syrup
     • Fruit juice concentrates
24   • High-fructose corn syrup
     • Honey
25   • Invert sugar
     • Malt sugar
26   • Molasses
     • Raw sugar
27   • Sugar
     • Sugar molecules ending in "ose" (dextrose, fructose, glucose, lactose, maltose,
28     sucrose)

- Syrup

http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/Sugars-101_UCM_306024_Article.jsp.  Like the United States government's list, this list also fails to contain the term evaporated cane juice.

90. In addition, the AHA warns that consumers "need to reduce added sugar" in their diets and therefore the AHA has recommended very strict added sugar guidelines stating:

Over the past 30 years, Americans have steadily consumed more and more added sugars in their diets, which has contributed to the obesity epidemic. Reducing the amount of added sugars we eat cuts calories and can help you improve your heart health and control your weight.

The American Heart Association recommends limiting the amount of added sugars you consume to no more than half of your daily discretionary calorie allowance. For most American women, this is no more than 100 calories per day and no more than 150 calories per day for men (or about 6 teaspoons per day for women and 9 teaspoons per day for men) *(emphasis added).*

http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/Sugars-101_UCM_306024_Article.jsp

91. Similarly, the Harvard School of Public Health takes the same position with respect to added sugar. According to the Harvard School of Public Health:

Added Sugar in the Diet

Your body doesn't need to get any carbohydrate from added sugar. That's why the Healthy Eating Pyramid says sugary drinks and sweets should be used sparingly, if at all, and the Healthy Eating Plate does not include foods with added sugars.

The American Heart Association (AHA) has recommended that Americans drastically cut back on added sugar to help slow the obesity and heart disease epidemics.

- The AHA suggests an added-sugar limit of no more than 100 calories per day (about 6 teaspoons or 24 grams of sugar) for most women and no more than 150 calories per day (about 9 teaspoons or 36 grams of sugar) for most men.

- There's no nutritional need or benefit that comes from eating added sugar. A good rule of thumb is to avoid products that have a lot of added sugar

http://www.hsph.harvard.edu/nutritionsource/cereal-sugar-content/.

92. The Harvard School of Public Health further notes that "[S]ome ingredient lists mask the amount of sugar in a product and informed consumers how to avoid being fooled by such

practices stating:

**How to spot added sugar on food labels**

Spotting added sugar on food labels can require some detective work. Though food and beverage manufacturers list a product's total amount of sugar per serving on the Nutrition Facts Panel, they are not required to list how much of that sugar is added sugar versus naturally occurring sugar. That's why you'll need to scan the ingredients list of a food or drink to find the added sugar.

When you eat an apple or carrot or bowl of steel-cut oatmeal, you know what you are eating—an apple or carrot or steel-cut oats. That's not the case with ready-to-eat breakfast cereals, cookies, frozen dinners, or any of the thousands of other processed foods. Think of these as terra incognita, and the ingredient list on the package as your map to it. But like an old pirate map, some ingredient lists are designed to confuse and muddle rather than lead you to the treasure. The biggest sleight of hand involves sugar. ……

The Nutrition Facts Label isn't much help. By law, it must list the grams of sugar in each product. But some foods naturally contain sugar, while others get theirs from added sweeteners, and food labeling laws don't require companies to spell out how much sugar is added….

Why does this matter? …

The American Heart Association (AHA) has recommended that Americans drastically cut back on added sugar to help slow the obesity and heart disease epidemics. (2) The AHA's suggested added sugar threshold is no more than 100 calories per day (about 6 teaspoons or 24 grams of sugar) for most women and no more than 150 calories per day (about 9 teaspoons or 36 grams of sugar) for most men.

http://www.hsph.harvard.edu/nutritionsource/cereal-sugar-content/.

93. While the Harvard School of Public Health notes it is possible to compare different

products and utilize math to figure out the amount (as opposed to the presence) of added

sugar in certain types of properly labeled products that disclose the presence of added

sugar, the comparison approach suggested by the school does not work when 1) the added

sugar is disguised by a false and misleading term like ECJ that conceals the presence of

added sugar. According to the Harvard School of Public Health:

Nutrition sleuths can compare the labels of two similar products—one with [added] sugar, one without—and do a little math to figure out how much sugar is added sugar. For example, a 6-ounce, fat-free plain Stonyfield Farm yogurt has 12 grams of sugar. The ingredients list shows no added sugar, so all of the yogurt's sugar comes from lactose, the sugar that is naturally found in milk. A fat-free vanilla Stonyfield Farm yogurt has 24 grams of sugar; the extra 12 grams is added sugar from "naturally milled organic sugar."

*Id.*

94. This approach does not work where there is no sweetener listed in the ingredient list that is recognized as an added sugar. In such a situation it is only possible to determine that one product has more total sugar than another but because of the concealed added sugar this would appear to consumers as merely the difference between levels of naturally occurring sugar in the two products.  It also is impractical to expect consumers who make purchase decisions in a fraction of a second to be have to perform mathematical calculations utilizing information gleaned from two separate product labels.

95. A term like ECJ that purports to be a juice conceals the presence of added sugars because by definition, 100% juice is a source of natural sugars and no added sugars. Thus as confirmed by University of Florida "100% fruit juice has no added sugars." https://edis.ifas.ufl.edu/pdffiles/FY/FY135800.pdf. Thus, accurate descriptions are necessary in ingredient lists because:

> although the [nutritional facts] panel is helpful for finding total sugar, it does not differentiate between natural sugar and added sugars. For example, sugar would be listed on the Nutrition Facts Panel for both 100% orange juice and an orange drink, but only the orange drink will have sugar added to it.

*Id.*

96. The Mayo Clinic also is on record confirming 1) the difference between added sugar and naturally occurring sugar; 2) the health risks posed by added sugar; 3) the need to avoid added sugars and limit consumption of foods containing added sugars; 4) the importance of the ingredient list in identifying added sugar; 5) the inability to use the Nutrition Facts line item for sugar to determine whether added sugar was present and 6) the numerous names used for added sugars. According to the Mayo Clinic:

**Added sugar: Don't get sabotaged by sweeteners -**

**Do you know how much sugar is in your diet? See why added sugar is a concern and how you can cut back.**

"Added sugar" refers to sugars and syrups added to foods during processing.

**Why is added sugar a problem?**

Foods with a lot of added sugar contribute extra calories to your diet but provide little nutritional value. In addition, added sugar is often found in foods that also contain solid fats.

Eating too many foods with added sugar and solid fats sets the stage for potential health problems, such as:

- **Poor nutrition.** If you fill up on foods laden with added sugar, you may skimp on nutritious foods, which means you could miss out on important nutrients, vitamins and minerals. Regular soda plays an especially big role. It's easy to fill up on sweetened soft drinks and skip low-fat milk and even water — giving you lots of extra sugar and calories and no other nutritional value.

- **Weight gain.** There's usually no single cause for being overweight or obese. But added sugar may contribute to the problem. Many foods and beverages contain lots of sugar, making them more calorie-dense. When you eat foods that are sugar sweetened, it is easier to consume more calories than if the foods are unsweetened.

- **Increased triglycerides.** Triglycerides are a type of fat in the bloodstream and fat tissue. Eating an excessive amount of added sugar can increase triglyceride levels, which may increase your risk of heart disease.

- **Tooth decay.** All forms of sugar promote tooth decay by allowing bacteria to proliferate and grow. The more often and longer you snack on foods and beverages with either natural sugar or added sugar, the more likely you are to develop cavities, especially if you don't practice good oral hygiene.

In the 2010 Dietary Guidelines for Americans, the U.S. Department of Agriculture (USDA) recommends that no more than about 5 to 15 percent of your total daily calories come from added sugar and solid fats.

The American Heart Association has even more-specific guidelines for added sugar — no more than 100 calories a day from added sugar for most women and no more than 150 calories a day for most men. That's about 6 teaspoons of added sugar for women and 9 for men.

Unfortunately, most Americans get more than 22 teaspoons — or 355 calories — of added sugar a day, which far exceeds these recommendations.

http://www.mayoclinic.com/health/added-sugar/my00845.

97. The Mayo Clinic Reports that:

Identifying added sugar can be confusing. Most people look at the Nutrition Facts part of the label for the total number of grams of sugar in a serving of the product. It's important to realize, however, that the amount shown includes natural sugars found in certain ingredients, such as grain, fruit and milk. The only reliable way to identify added sugar is to look at the ingredient list….Know that sugar goes by many different names, though.

**Different names for added sugar**

Sugar goes by many different names, depending on its source and how it was made. This can also make it hard to identify added sugar, even when you read ingredient lists and food labels.

http://www.mayoclinic.com/health/added-sugar/my00845.

98. Not only do government and nationally recognized health institutions and associations advise on the manners in which to detect and determine added sugar, but reputable food related companies such as grocery store chains and food manufacturers have adopted a similar approach with respect to added sugars: For example the Shoprite chain of grocery stores states that:

The nutrition panel of packaged foods lists the total amount of sugars in a serving of food. This number includes sugars found naturally in food as well as the sugar that is added. The ingredient list must state all the sugars which are added to the product.

Sugar can often be "disguised" on food labels since there are many different forms and names for sugar. ….

What's the bottom line?

Choose healthy foods that contain natural sugars most often and limit your consumption of foods high in added sugar. Be an informed shopper. Read the ingredient panel to be sure you are truly getting a product without a lot of added sugar.

http://www.shoprite.com/for-your-family/dietitians-corner/archives/sugar-by-any-other-name-is-still-sugar/

99. Similarly, the Publix chain of grocery stores states:

Controlling added sugars is important because it helps us avoid excess calories, which can lead to increased weight and triglycerides—two factors that can put you at higher risk of obesity, heart attack and stroke.

The AHA suggests women limit their intake of added sugars to 6 teaspoons daily; men should limit intake to 9 teaspoons. The recommendations do not apply to naturally occurring sugars, such as those found in fruits, vegetables or dairy products.

Check food label ingredients for hidden sugars like corn syrup, fructose, dextrose, molasses or evaporated cane juice.

http://www.publix.com/wellness/greenwise/products/ProductDetail.do?id=1930

100.      Similarly, Atkins Nutritionals, the company behind the Atkins line of food products states:

**Finding Added Sugars**

Taking control of your health is about focusing on carbohydrate foods that are high in nutrients and fiber. That's why added sugar in any form should be avoided in the weight loss phases of Atkins. No matter what it's called sugar has virtually no nutritional value.

1

**What's the Difference?**

2

*Naturally occurring sugars,* found in dairy products or in fruit or vegetables, for instance, are an organic part of the food, and they are perfectly acceptable. An example: sugar free ice cream has some naturally occurring sugars from the milk and cream with which it is made. That same ice cream might also include some strawberries (which contain fruit sugar). Both sugars are natural, making the ice cream suitable for healthy lifestyles.

3

4

5

*Added sugars* lurk in many foods and not just in the form of sucrose (table sugar). Added sugar is often disguised with misleading names in packaged foods. These include cane sugar and evaporated cane juice, brown sugar, beet sugar or any other ingredient ending in "sugar," as well as syrups (or syrup solids) such as maple, corn or cane. Many ingredients ending in "ose" are also sugars, although exceptions include sucralose and cellulose.

6

7

8

9

To complicate matters, a natural sugar, such as fructose, is considered an added sugar from a regulatory point of view and can also take the form of an added sugar when it's included in processed foods. The Nutrition Facts panel tells you the number of grams of sugars in a serving, but because it lumps together all sugars, it does not distinguish between integral and added sugars. Instead, you'll need to go to the ingredients list. If you see fructose listed instead of fruit, for example, even though that sugar has a natural source, you'll know it's an added ingredient you should limit your exposure to. Here are various aliases for added sugars:  brown sugar, cane syrup, corn sweetener, corn syrup, corn syrup solids, dextrose, fructose, fruit juice concentrate, galactose, glucose, high-fructose corn syrup, honey, invert sugar, lactose, malt, maltose, malt syrup, maple syrup, molasses, raw sugar, rice syrup, and sucrose.

10

11

12

13

14

15

http://www.atkins.com/Science/Articles---Library/Sugar/Finding-Added-Sugars.aspx

16

101.      The Plaintiff would not have bought the Defendants' products he bought had he

17

known they contained "added sugar." Although Plaintiff read the ingredient lists of the

18

Defendants' products he purchased, he did not realize that evaporated cane juice was 1)

19

sugar or a syrup; 2) a form of added sugar; 3) a refined sugar or 4) not a juice. Plaintiff's

20

failure to realize that evaporated cane juice was 1) sugar or a syrup; 2) a form of added

21

sugar; 3) a refined sugar or 4) not a juice was reasonable and any reasonable consumer

22

would have been mislead by the false and misleading term evaporated cane juice.

23

102.      Plaintiff would not have bought the products he purchased if he had known they

24

contained an added sugar or syrup; a refined sugar or sweetener; or that evaporated cane

25

juice was not a juice but rather sugar or syrup and an added sugar and a refined sweetener.

26

The Nutrition Facts panels of the products purchased by Plaintiff did not reveal the

27

presence of added sugars, and the false and misleading term evaporated cane juice in the

28

1    ingredient list concealed the presence of any added sugar or refined sugar.

2    103.    When Plaintiff read the ingredient list he did not realize that there was added sugar

3    in the Defendants' products because he did not recognize the term ECJ as being sugar

4    because the term (which the FDA has held to be a false and misleading term) misled them.

5    ECJ was not the common or usual term for the ingredient in question which was actually a

6    refined form of sugar or cane syrup.  Defendants' use of a term that included the word

7    juice, but not the words sugar or syrup, failed to accurately characterize the ingredient in

8    question and the FDA concurs with this allegation. While Plaintiff could determine the

9    total amount of sugars in the product from the nutritional facts table assuming it was

10   accurate, he could not determine if there were any added sugars/syrups because the

11   Defendants' ingredient lists concealed the presence of such added sugars by the use of a

12   the false and misleading term ECJ. Plaintiff could also not determine the relative amount

13   of any added sugars because the term ECJ was not recognized by them as a sugar and thus

14   its relative position in the ingredient list (where ingredients are required to be listed in

15   descending order by weight) did not inform them of the level of added sugar.

16   104.    Defendants' failure to utilize either the term "sugar" or the term "syrup" to

17   describe the ingredient it identified as evaporated cane juice failed to reveal the basic

18   nature of the ingredient and its characterizing properties (*i.e.*, that the ingredients are

19   sugars or syrups). According to the FDA:

20   FDA's regulatory approach for the nomenclature of sugar and syrups is that sugar
     is a solid, dried, and crystallized food; whereas syrup is an aqueous solution or
21   liquid food. FDA's regulations permit the term "sugar" as part of the name for
     food that is solid, dried, and crystallized, specifically the standards of identity for
22   dextrose monohydrate (21 CFR 168.111) and lactose (21 CFR 168.122), and the
     GRAS regulation for sucrose (21 CFR 184.1854). FDA's regulations provide for
23   the terms "syrup" or "sirup" for food that is liquid or is an aqueous solution,
     specifically the standards of identity for glucose sirup (21 CFR 168.120), cane
24   sirup (21 CFR 168.130), maple sirup (21 CFR 168.140), sorghum sirup, (21 CFR
     168.160), and table sirup (21 CFR 168.180).  FDA's approach is consistent with
25   the common understanding of sugar and syrup as referenced in a dictionary.

26   105.    Based on the inclusion of the word "evaporated" in the term evaporated cane juice,

27   Plaintiff would show that the sweetener in the Defendants' products is sugar, a dried

28   crystallized ingredient, as defined in 21 C.F.R. § 101.4(b)(20) and 21 C.F.R. § 184.1854.

1    However, even if the added sugar was a form of cane syrup, it would make no difference.

2    In either case, the Defendants utilized a false and misleading term, evaporated cane juice,

3    to conceal the fact that Defendants were utilizing an added sugar to sweeten their

4    products.  In either case the false and misleading term, evaporated cane juice, failed to

5    reveal the basic nature of the ingredient and its characterizing properties (*i.e.*, that the

6    ingredients are sugars or syrups).

7    106.    While FDA regulations provide that "[t]he name of an ingredient shall be a

8    specific name and not a collective (generic) name" the regulations expressly provide that

9    "[f]or purposes of ingredient labeling, the term *sugar* shall refer to sucrose, which is

10   obtained from sugar cane or sugar beets in accordance with the provisions of 184.1854 of

11   this chapter. 21 C.F.R. § 101.4(b)(20)(emphasis in original). 21 C.F.R. § 184.1854 list the

12   chemical names, CAS number and structure of sugar/sucrose (C12 H22 O11, CAS Reg.

13   No. 57-50-11-1, β-D-fructofuranosyl-α-D-glucopyranoside) as well as its common names

14   (sugar, sucrose, cane sugar, or beet sugar). 21 C.F.R. § 184.1854 also confirms that the

15   definition of sugar/sucrose covers products "obtained by crystallization from sugar cane or

16   sugar beet juice that has been extracted by pressing or diffusion, then clarified and

17   evaporated." As such, Defendants were required to identify the ingredient in question as

18   sugar and could not call it evaporated cane juice.

19   107.    The term "sugar" indicates to reasonable consumers the ingredient sugar.

20   Similarly, the term syrup connotes a type of sweetener that contains sugar.  Syrup is

21   defined by numerous dictionaries as some variation of "a concentrated solution of sugar in

22   water" ("a concentrated solution of sugar in water;" "a concentrated solution of a sugar,

23   such as sucrose, in water;" a thick sticky liquid consisting of a concentrated solution of

24   sugar and water;" "a very sweet, thick light colored liquid made by dissolving sugar in

25   water;" "a sweet liquid made from sugar and water;" etc. Thus, had the Defendants used

26   the words sugar or syrup to describe the ingredient it described as evaporated cane juice it

27   could have informed consumers of the presence of added sugar. The Defendants' failure to

28   utilize either term concealed the presence of added sugars in the Defendants' products.

108.     Defendants further concealed the presence of added sugars in their products by

utilizing the false and misleading term evaporated cane juice to describe an added

sweetener that was not in fact juice but was rather sugar. According to the FDA:

> The product extracted from sugar cane is either "sugar" (21 CFR §101.4(b)(20)
> and § 184.1854), or "cane syrup" if the product conforms to the standard of
> identity for "cane syrup" (21 CFR §168.130).… These sweeteners should not be
> declared in the ingredient declaration by names which suggest that the ingredients
> are juice, e.g "evaporated juice" or "nectar", or in such a way as to suggest that the
> ingredients contain no sugar, e.g."natural extract of _". Such representations ....
> fail to reveal the basic nature of the food and its characterizing properties, i.e. the
> ingredients are sugar or syrups. They are not juice. .. .. .. As you know, many of
> FDA's criminal prosecutions of manufacturers and seizures of fruit juices for
> economic adulteration have involved precisely these sweeteners being
> misrepresented in such a way as to mislead consumers. ......We trust that the
> foregoing will be helpful in providing guidance on the appropriate labeling of
> these ingredients.

http://www.regulations.gov/#!documentDetail;D=FDA-2009-D-0430-0005

109.     The FDA has repeatedly made clear that:

> FDA's current policy is that sweeteners derived from sugar cane syrup should not
> be declared as "evaporated cane juice" because that term falsely suggests that the
> sweeteners are juice…. "Juice" is defined by 21 CFR 120.1(a) as "the aqueous
> liquid expressed or extracted from one or more fruits or vegetables, purees of the
> edible portions of one or more fruits or vegetables, or any concentrates of such
> liquid or puree." Although FDA does not dispute that sugar cane is a member of
> the vegetable kingdom in the broad sense of classifying an article as "animal,"
> "vegetable," or "mineral," the agency considers the term "vegetable" in the
> context of the juice definition to refer more narrowly to edible plant parts that
> consumers are accustomed to eating as vegetables in their diet. Sugar cane is not a
> vegetable in this sense. While consumers can purchase pieces of sugar cane,
> consumers do not eat sugar cane as a "vegetable" but instead use it as a source of
> sugar by chewing on the cane or its fibers or by placing the cane in a beverage to
> sweeten it. There are other plant juices used for human food that similarly are not
> "vegetable juice" or "fruit juice" for purposes of the juice definition; e.g., maple
> syrup and sorghum syrup. In summary, FDA's view is that the juice or extract of
> sugar cane is not the juice of a plant that consumers are accustomed to eating as a
> vegetable in their diet and is not, therefore, "juice" as contemplated by the
> regulation defining that term.

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm181491.htm.

110.     The FDA has further confirmed that:

> "evaporated cane juice" and other sweeteners derived from sugar cane syrup are
> not "juice" as defined in 21 CFR 120.1…. Sweeteners derived from sugar cane
> syrup should not be listed in the ingredient declaration by names which suggest
> that the ingredients are juice, such as "evaporated cane juice." FDA considers
> such representations to be false and misleading under section 403(a)(1) of the Act
> (21 U.S.C. 343(a)(1)) because they fail to reveal the basic nature of the food and

its characterizing properties (i.e., that the ingredients are sugars or syrups) as required by 21 CFR 102.5 … sweeteners derived from sugar cane syrup are not juice…

111.     It was thus false and misleading for the Defendants to use the term evaporated cane juice to identify the added sugar derived from sugar cane it used as an ingredient. Moreover, reasonable consumers do not consider juice to be a sugar or syrup or a refined sugar. Thus, it was false and misleading for the Defendants to use the term evaporated cane juice to describe the refined sugar (or in the alternative syrup) its products used as a sweetener. Nor do reasonable consumers consider juice to be an added sugar. To the contrary, consumers are instructed by the federal government and other entities that if they wish to avoid added sugar they should look for juice because juice is not an added sugar nor does it contain added sugar and is thus a way to avoid added sugars. Thus, it was false and misleading for the Defendants to use the term evaporated cane juice to describe the added sugar its products used as a sweetener.

112.     Moreover, it is clear that the term evaporated cane juice was intended to and did mislead consumers about the presence of sugars. In fact industry participants have openly discussed this act.

113.     For example, the in-house magazine for Whole Foods contains an article entitled "Could Cane Juice" Evaporate?" which details the following:

A regulatory issue on the U.S. Food and Drug Administration's (FDA) backburner, and one that is therefore flying under the radar, involves the fate of the sweetener evaporated cane juice. Like high fructose corn syrup's ongoing name battle, this is a question of language, not substance. According to Jim Morano, Ph.D., technical affiliate of Suzanne's Specialties, New Brunswick, NJ, FDA has taken exception to the use of the word "juice" to describe this sugar cane-based sweetener on product labels…..The agency feels that the term fails to reveal the defining property of the sweetener, that the ingredients are sugars or syrups, and so the term may be false and misleading to consumer.

"It's only been the last 15 years that we've had the ability to use sugar. In the beginning in the health food industry, sugar was a bad word," says Morano. Sugar was often considered to be a violation of the natural tenet, even though it is, of course, natural. Though times have changed, this negative connotation still clings to sugar for many shoppers. Therefore, if FDA takes away the term "evaporated cane juice," essentially dictating that it be referred to as a type of cane sugar, Morano believes the jig may be up for this sweetener, at least when it comes the natural market.
http://www.wholefoodsmagazine.com/grocery/features/sweeteners-rising.

114.     Similarly, according to the CEO of ASSURKKAR Sugar Company in Costa Rica, which provides raw sugar to U.S. companies, the term is wrongly used in the food industry, "prostituted" he put it. "Nowadays the food companies are trying to sell more 'natural' products, so they use the most impressive or high impact wording to call the customers' attention" • he said. In reality, the "evaporated cane juice" that is used in food products is a very processed form of sugar, unequivocally the same as refined white sugar. http://www.processedfreeamerica.org/index.php?option=com_content&view=article&id=535:raw-sugar.

115.     Additionally, Judy Sanchez, a spokesperson for the U.S. Sugar Corp., confirms that "All sugar is evaporated cane juice," "They just use that for a natural-sounding name for a product." http://www.npr.org/blogs/thesalt/2012/10/18/163098211/evaporated-cane-juice-sugar-in-disguise

116.     Defendants' use of the word "cane" was not sufficient to advise Plaintiff that "evaporated cane juice" was sugar.  The term "cane" is not exclusively a reference to sugar or sugar cane. Many other types of cane exist and are used in foods, for example, bamboo cane and sorghum cane, both which produce juice.  See e.g. 21 C.F.R. § 168.160 ("sorghum cane"). Corn is a form of cane. There are over 1000 species just of bamboo and over 10,000 members of the family of plants that includes corn and sugar cane. Most common berries such as blackberries, raspberries, blue berries and goji berries grow on canes and are referred to as "cane berries." Of course, Defendants utilized the term "cane" with the term "juice," a defined, regulated term not commonly associated with sugar or added sugar.

117.     Moreover, the cane sugar utilized as an ingredient by Defendants was far removed from natural sugar cane or unrefined sugar cane juice. Natural sugar cane is described by sources as healthy and nutritious, containing vitamins, minerals, enzymes, fibers, and phytonutrients that help the body digest naturally occurring sugars, such as lactose, glucose and fructose. It also is reported to contain vitamins A, C, B1, B2, B6, niacin, and pantothenic acid, which work synergistically with the minerals to nourish the body. Sugar cane also reportedly contains a unique mix of antioxidant polyphenols. The polyphenols,

AMENDED CLASS ACTION COMPLAINT
CASE NO CV12-05652 (EJD)

vitamins, and minerals present in sugar cane are claimed to help slow down the absorption of the sugars and prevent the sharp rise in blood sugar levels associated with refined sugar. [4] Similarly, raw sugar cane juice has been described as a "wonder food" that has many beneficial properties. For example, one website states:

> Sugarcane is a tall grass with a stout, jointed and fibrous stalk that looks similar to bamboo. As a member of the grass family, its juice has a high potency equivalent to wheatgrass juice, only with less chlorophyll and more sugar content. However, counter to what you might think, sugarcane juice contains only about fifteen percent total sugar content, all of which is in a raw unrefined form. The rest of the juice consists of water brimming with an abundance of vitamins and minerals. Sugarcane is rich in calcium, chromium, cobalt, copper, magnesium, manganese, phosphorous, potassium and zinc. It also contains iron and vitamins A, C, B1, B2, B3, B5, and B6, plus a high concentration of phytonutrients (including chlorophyll), antioxidants, proteins, soluble fiber and numerous other health supportive compounds. Working synergistically, these nutrients provide a supremely health-promoting food which has been studied for its role in fighting cancer, stabilizing blood sugar levels in diabetics, assisting in weight loss, reducing fevers, clearing the kidneys, preventing tooth decay, and a host of other health benefits.
> http://www.processedfreeamerica.org/index.php?option=com_content&view=article&id=535:raw-sugar.

The "evaporated cane juice" in the Defendants' products contains none of these health benefits because during processing the nutrients have been pressed, boiled and strained out.[5]

118.     Thus, evaporated cane juice is neither "juice" nor only subject to "evaporation" – a process that absent pressing, boiling, and separation would leave the sugar crystals with their nutrients still intact. [6]*Id.* In truth, evaporated cane juice is little different than added refined sugar. Refined sugar and evaporated cane juice both have 111 calories per ounce. Both types of sugar come from the same cane crop, and they are both about 99% sucrose

---

[4] *See* McCaffree, D., The Truth About Evaporated Cane Juice, Processed-Free America (Nov. 1, 2010) *available at* http://www.processedfreeamerica.org/resources/health-news/405-the-truth-about-evaporated-cane-juice?format=pdf.

[5] During refinement, the sugarcane juice is pressed from the sugar cane and boiled at high temperatures. The boiling destroys the enzymes and many of the nutrients. The juice is then separated into a sugar stream and a molasses stream. Most of the minerals from the sugar cane go into the molasses, leaving the sugar stream virtually void of nutrients. To further refine it (removing any remaining nutrients), the sugar stream is then crystallized through evaporation." McCaffree, D., The Truth About Evaporated Cane Juice, Processed-Free America (Nov. 1, 2010), [6] *Id.*

(*i.e.*, empty calories) and not the 15% sucrose content ascribed to raw sugar cane juice.[7]

## C.    "Natural" Claims

119.    The following Purchased Products have an unlawful and misleading "all natural" (or "Naturale") claim:

- 365 Everyday Value Cola ("All Natural")
- 365 Everyday Value Ginger Ale  ("All Natural")
- 365 Everyday Value Root Beer  ("All Natural")
- Natural Italian Soda in green apple flavor ("Naturale")
- Natural Italian Soda in blood orange flavor ("Naturale")

120.    In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22.

121.    The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.

122.    The FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food."  *See* 58 FR 2302, 2407, January 6, 1993.

123.    Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.  Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

124.    The Defendants make numerous unlawful "all natural, "natural" and "naturale" claims on its products. For example, Defendants' labeling practices of its "all natural" and "natural" sodas violate the 2009 FOP Guidance Sec. 587.100, which states:  "[t]he use of

---

[7] *See id.* (stating that "[a]nother important aspect of natural sugar cane is the balance of the different types of sugars. Raw natural sugar has a balance of sucrose, glucose, and fructose, whereas refined sugars are almost exclusively sucrose (the fructose and glucose have been washed out). The more sucrose, the more it raises your blood sugar").

1    the words 'food color added,' 'natural color,' or similar words containing the term 'food'

2    or 'natural' may be erroneously interpreted to mean the color is a naturally occurring

3    constituent in the food.  Since all added colors result in an artificially colored food, we

4    would object to the declaration of any added color as 'food' or 'natural.'"

5    125.    Likewise, California Health & Safety Code § 110740 prohibits the use of artificial

6    flavoring, artificial coloring and chemical preservatives unless those ingredients are

7    adequately disclosed on the labeling.

8    126.    The FDA has sent out numerous warning letters concerning this issue.

9    Defendants are aware of these FDA warning letters.

10   127.    Defendants have unlawfully labeled some of its food products as being "All

11   Natural," "Natural" or "Naturale" when they actually contain artificial ingredients and

12   flavorings, artificial coloring and chemical preservatives.  For example, Defendants' 365

13   Everyday Value Cola bought by the Plaintiff is represented to be "all natural" but contains

14   caramel coloring, tartaric acid, citric acid and carbon dioxide.  Defendants' 365 Everyday

15   Value Ginger Ale and Root Beer bought by the Plaintiff are represented to be "all natural"

16   but contain caramel coloring, citric acid and carbon dioxide.  Similarly, Defendants sold

17   the Natural Italian Soda in green apple and blood orange flavors bought by the Plaintiff,

18   the labels of which misleadingly represented them as "natural" when they actually contain

19   artificial ingredients such as citric acid or ascorbic acid used to preserve food and/or

20   impart tart flavor to products that lack such flavor naturally.  Defendants also sold the

21   Whole Foods Market Natural Green Apple Italian Soda in green apple and blood orange

22   flavors bought by the Plaintiff, the labels of which misleadingly represented them as

23   "naturale" when they contained color additives such as beet or black carrot juices.

24   128.    The labels of Defendants' All Natural Soda and Bibita Naturale products are

25   reproduced in Exhibit 1 attached hereto.

26   129.    21 C.F.R. § 70.3(f) makes clear that "where a food substance such as beet juice is

27   deliberately used as a color, as in pink lemonade, it is a color additive."  Similarly, any

28   coloring or preservative can preclude the use of the term "natural" even if the coloring or

1   preservative is derived from natural sources.  The FDA distinguishes between natural and

2   artificial flavors in 21 C.F.R. § 101.22.

3   130.    The FDA has also repeatedly affirmed its policy regarding the use of the term

4   "natural" as meaning that nothing artificial or synthetic (including all color additives

5   regardless of source) has been included in, or has been added to, a food that would not

6   normally be expected to be in the food.  Any coloring or preservative can preclude the use

7   of the term "natural" even if the coloring or preservative is derived from natural sources.

8   131.    A reasonable consumer would expect that when Defendants label and represent

9   their products as "All Natural, "Natural," or "Naturale," the product's ingredients are

10  "natural" as defined by the federal government and its agencies.  A reasonable consumer

11  would also expect that when Defendants label their products as "All Natural, "Natural," or

12  "Naturale," the product ingredients are "natural" under the common use of that word.  A

13  reasonable consumer would understand that "natural" products do not contain synthetic,

14  artificial, or excessively processed ingredients.

15  132.    Consumers are thus misled into purchasing Defendants' products with ingredients

16  that are not natural as falsely represented on their labeling.  Defendants' products in this

17  respect are misbranded under federal and California law.  Plaintiff did not know, and had

18  no reason to know, that the Purchased Products were misbranded, and bore natural claims

19  despite failing to meet the requirements to make those natural claims. Plaintiff would not

20  have bought these products had they been accurately labeled and disclosed the information

21  required by law.  Because of this improper manner in which ingredients were described,

22  Plaintiff purchased Defendants' products and paid premiums for them.   Defendants have

23  violated these referenced regulations and thus misled Plaintiff and the Class who were

24  injured as a result and suffered economic loss.

25  **VIII.   DEFENDANTS HAVE VIOLATED CALIFORNIA LAW**

26  133.    Defendants have violated California Health & Safety Code § 110390 which makes

27  it unlawful to disseminate false or misleading food advertisements that include statements

28  on products and product packaging or labeling or any other medium used to directly or

AMENDED CLASS ACTION COMPLAINT
CASE NO CV12-05652 (EJD)

1    indirectly induce the purchase of a food product.

2    134.    Defendants have violated California Health & Safety Code § 110395 which makes

3    it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food.

4    135.    Defendants have violated California Health & Safety Code §§ 110398 and 110400

5    which make it unlawful to advertise misbranded food or to deliver or proffer for delivery

6    any food that has been falsely advertised.

7    136.    Defendants have violated California Health & Safety Code § 110660 because their

8    products' labeling are false and misleading in one or more ways.

9    137.    Defendants have violated California Health & Safety Code § 110665 because their

10   labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. §

11   343(q) and the regulations adopted thereto.

12   138.    Defendants have violated California Health & Safety Code § 110670 because their

13   labeling fails to conform to the requirements for nutrient content and health claims set

14   forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

15   139.    Defendants have violated California Health & Safety Code § 110705 because

16   words, statements and other information required by the Sherman Law to appear on their

17   labeling either are missing or not sufficiently conspicuous.

18   140.    Defendants have violated California Health & Safety Code § 110725 as they fail to

19   state the common or usual name of each ingredient.

20   141.    Defendants violated California Health & Safety Code § 110740 because they

21   contain artificial flavoring, artificial coloring and chemical preservatives but fail to

22   adequately disclose that fact on their labeling.

23   142.    Defendants have violated California Health & Safety Code § 110755 because they

24   purport to be or are represented for special dietary uses, and its labels fail to bear such

25   information concerning their vitamin, mineral, and other dietary properties as the

26   Secretary determines to be, and by regulations prescribes as, necessary in order fully to

27   inform purchasers as to its value for such uses.

28   143.    Defendants have violated California Health & Safety Code § 110760 which make

1    it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food

2    that is misbranded.

3    144.    Defendants have violated California Health & Safety Code § 110765 which makes

4    it unlawful for any person to misbrand any food.

5    145.    Defendants have violated California Health & Safety Code § 110770 which make

6    it unlawful for any person to receive in commerce any food that is misbranded or to

7    deliver or proffer for deliver any such food.

8    146.    Defendants have violated the standards set by 21 C.F.R. § 1.21, 101.3, 101.4,

9    101.13, 101.60, and 102.5 which have been incorporated by reference in the Sherman

10    Law, by using terms unlawfully, failing to include on its product labels the nutritional

11    information required by law and by utilizing unlawful labeling practices.

12    **IX.    PLAINTIFF BOUGHT THE PURCHASED PRODUCTS**

13    147.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy

14    diet.

15    148.    Plaintiff has bought the Purchased Products since 2008 and throughout during the

16    Class Period.  Plaintiff has spent more than $25.00 on the Purchased Products.

17    149.    Plaintiff read and reasonably relied on the labels on the Purchased Products before

18    purchasing them as described herein. Plaintiff relied on Defendants' labeling as described

19    herein and based and justified the decision to purchase Defendants' products, in

20    substantial part, on these labels.

21    150.    Plaintiff relied on Defendants' package labeling including the Ingredient,

22    "evaporated cane juice" and the "natural" claims and the representation that products were

23    free or artificial colors, preservatives or flavors and based and justified the decision to

24    purchase Defendants' products in substantial part on Defendants' package labeling claims.

25    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy diet.

26    Plaintiff read the labels on Defendants' Misbranded Food Products, including the

27    "evaporated cane juice", the "All Natural" and "Naturale" claims on the labels, before

28    purchasing them.  Based on those representations, Plaintiff purchased the identified

1    products. Based on the product labels, Plaintiff believed Defendants' products that he

2    purchased contained only natural sugars and did not contain added sugars or syrups.

3    Further, Plaintiff believed Defendants' products that he purchased contained only natural

4    ingredients. Likewise, at point of sale, Plaintiff did not know, and had no reason to know,

5    that Defendants' "evaporated cane juice", "All Natural" and "Naturale" claims were

6    unlawful and unauthorized as set forth herein.  Had Plaintiff known Defendants' products

7    that he purchased contained added sugar or syrup and unnatural and artificial ingredients,

8    he would not have purchased the Products.  As a result, Plaintiff suffered injury-in-fact

9    and lost money.

10   151.    Plaintiff would show that he seeks to avoid and/or minimize added sugar in the

11   products that he purchases.  Plaintiff would show that at the time he read the labels of

12   Defendants' products, he attempted to determine whether Defendants' products contained

13   "added sugar" by reading the ingredient list.  We would further show that when he read

14   the ingredient list of Defendants' products to determine if sugar had been added as an

15   ingredient, "sugar" was not listed and thus he was led to believe that Defendants' products

16   that he purchased did not contain added sugar as an ingredient.  He did not know that the

17   ingredient "evaporated cane juice" was, in reality, sugar at the time he made his purchase.

18   Had he known "evaporated cane juice" was the same thing as added sugar or syrup,

19   Plaintiff would not have purchased Defendants' products. Plaintiff would show that while

20   he did not know what evaporated cane juice was at the time he purchased Defendants'

21   products, because of the fact it used the term "juice", it sounded like something healthy.

22   152.    At point of sale, Plaintiff did not know, and had no reason to know, that the

23   Purchased Products were unlawful and misbranded as set forth herein, and would not have

24   bought the products had he known the truth about them, including the fact that that the

25   products were illegal to purchase and possess.

26   153.    After Plaintiff learned that Defendants' Purchased Products were falsely labeled,

27   he stopped purchasing them.

28

128.    As a result of Defendants' unlawful conduct, Plaintiff and thousands of others in California and throughout the United States purchased the Purchased Products at issue.

129.    Defendants' labeling, advertising and marketing as alleged herein are false and misleading and were designed to increase sales of the products at issue.  Defendants' misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendants' misrepresentations in determining whether to purchase the products at issue.

130.    A reasonable person would also attach importance to whether Defendants' products were legally salable, and capable of legal possession, and to Defendants' representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendants' products had he known they were not capable of being legally sold or held.

154.    Plaintiff's purchase of the Purchased Products damaged Plaintiff because misbranded products cannot be legally sold, possessed, have no economic value and are legally worthless.

155.    Plaintiff's purchase of the Purchased Products damaged Plaintiff because Plaintiff paid an unwarranted premium for the Purchased Products when cheaper alternatives were available.

## X.    CLASS ACTION ALLEGATIONS

156.    Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

All persons in the United States, and alternatively, in a subclass of consumers in California who, within the last four years, purchased any of the Purchased Products or Substantially Similar Products

(1) containing "evaporated cane juice" as an ingredient;

(2) labeled or advertised as "All Natural, " Natural," or "Naturale" despite containing artificial or unnatural ingredients, flavorings, coloring, and/or chemical preservatives;

157.    The following persons are expressly excluded from the Class:  (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded

from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

158.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

159.    <u>Numerosity</u>:  Based upon Defendants' publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

160.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, just for example:

    a.  Whether Defendants engaged in unlawful, unfair or deceptive business practices by failing to properly package and label products sold to consumers;

    b.  Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

    c.  Whether the Defendants made unlawful and misleading "all natural" or "natural" or "naturale" claims;

    d.  Whether the Defendants failed to use the common or usual name of all its products' ingredients and instead utilized the unlawful and misleading term "evaporated cane juice;"

    e.  Whether Defendants made unlawful and misleading express or implied nutrient content claims with respect to their food products sold to consumers;

    f.  Whether Defendants made unlawful and misleading representations that its products were free from artificial colors, flavors or preservatives;

    g.  Whether Defendants failed to adequately disclose the sugar content of its food products sold to consumers;

    h.  Whether Defendants violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the California Consumers Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.*, and the Sherman Law;

    i.  Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

j. Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

161.   Typicality:  Plaintiff's claims are typical of the claims of the Class because Plaintiff bought the Purchased Products during the Class Period.  Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct in violation of California law.  The injuries of each member of the Class were caused directly by Defendants' wrongful conduct.  In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

162.   Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.  Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the members of the Class.  Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

163.   Superiority:  There is no plain, speedy or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense

that numerous individual actions would engender.  Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.  Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

164.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

165.     The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

166.     Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## XI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### <u>Unlawful Business Acts and Practices</u>

167.     Plaintiff incorporates by reference each allegation set forth above.

168.     Defendants' conduct constitutes unlawful business acts and practices.

169.     Defendants sold the Purchased Products in California and throughout the United States during the Class Period.

170.     Defendants are corporations and a limited partnership and, therefore, each is a "person" within the meaning of the Sherman Law.

171.     Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of the advertising provisions of Article 3 of the Sherman Law and the misbranded food provisions of Article 6 of the Sherman Law.

172.     Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

173.     Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendant's violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.

174.     Defendants sold Plaintiff and the Class products that were not capable of being sold, or held legally and which had no economic value and were legally worthless for which Plaintiff and the class paid a premium price for these products.

175.     As a result of Defendants' illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any Class Member any money paid for the Purchased Products.

176.     Defendants' unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and the Class.

177.     As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid by Plaintiff and the Class for Defendants' Purchased Products.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq*.**
**<u>Unfair Business Acts and Practices</u>**

178.     Plaintiff incorporates by reference each allegation set forth above.

179.     Defendants' conduct as set forth herein constitutes unfair business acts and

1    practices.

2    180.    Defendants sold the Purchased Products in California and throughout the United

3    States during the Class Period.

4    181.    Plaintiff and members of the Class suffered a substantial injury by virtue of buying

5    Defendants' Purchased Products that they would not have purchased absent Defendants'

6    illegal conduct.

7    182.    Defendants' deceptive marketing, advertising, packaging and labeling of the

8    Purchased Products and their sale of unsalable misbranded products that were illegal to

9    possess was of no benefit to consumers, and the harm to consumers and competition is

10    substantial.

11    183.    Defendants sold the Purchased Products that were not capable of being legally sold

12    or held and that had no economic value and were legally worthless.  Plaintiff and the Class

13    paid a premium price for the Purchased Products.

14    184.    Plaintiff and the Class who purchased the Purchased Products had no way of

15    reasonably knowing that the products were misbranded and were not properly  marketed,

16    advertised, packaged and labeled, and thus could not have reasonably avoided the injury

17    each of them suffered.

18    185.    The consequences of Defendants' conduct as set forth herein outweigh any

19    justification, motive or reason therefore.  Defendants' conduct is and continues to be

20    immoral, unethical, unscrupulous, contrary to public policy, and is substantially injurious

21    to Plaintiff and the Class.

22    186.    As a result of Defendants' conduct, Plaintiff and the Class, pursuant to Business

23    and Professions Code § 17203, are entitled to an order enjoining such future conduct by

24    Defendants, and such other orders and judgments which may be necessary to disgorge

25    Defendants' ill-gotten gains and restore any money paid for Defendants' Purchased

26    Products by Plaintiff and the Class.

27    **THIRD CAUSE OF ACTION**
     **Business and Professions Code § 17200,** *et seq.*
28    **Fraudulent Business Acts and Practices**

1    187.    Plaintiff incorporates by reference each allegation set forth above.

2    188.    Defendants' conduct as set forth herein constitutes fraudulent business practices

3         under California Business and Professions Code sections § 17200, *et seq.*

4    189.    Defendants sold the Purchased Products in California and throughout the United

5         States during the Class Period.

6    190.    Defendants' misleading marketing, advertising, packaging and labeling of the

7         Purchased Products and misrepresentation that the products were salable, capable of

8         possession and not misbranded were likely to deceive reasonable consumers, and in fact,

9         Plaintiff and members of the Class were deceived.  Defendants have engaged in fraudulent

10        business acts and practices.

11   191.    Defendants' fraud and deception caused Plaintiff and the Class to purchase the

12        Purchased Products that they would otherwise not have purchased had they known the true

13        nature of those products.

14   192.    Defendants sold Plaintiff and the Class the products that were not capable of being

15        sold or held legally and that had no economic value and were legally worthless for which

16        Plaintiff and the Class paid a premium price.

17   193.    As a result of Defendants' conduct as set forth herein, Plaintiff and the Class,

18        pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such

19        future conduct by Defendants, and such other orders and judgments which may be

20        necessary to disgorge Defendants' ill-gotten gains and restore any money paid for

21        Defendants' Purchased Products by Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**Misleading and Deceptive Advertising**

24   194.    Plaintiff incorporates by reference each allegation set forth above.

25   195.    Plaintiff asserts this cause of action for violations of California Business and

26        Professions Code § 17500, *et seq.* for misleading and deceptive advertising against

27        Defendants.

28   196.    Defendants sold the Purchased Products in California and throughout the United

1    States during the Class Period.

2    197.      Defendants engaged in a scheme of offering the Purchased Products for sale to

3    Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling.

4    These materials misrepresented and/or omitted the true contents and nature of the

5    products.  Defendants' advertisements and inducements were made within California and

6    throughout the United States and come within the definition of advertising as contained in

7    Business and Professions Code §17500, *et seq.* in that such product packaging and

8    labeling were intended as inducements to purchase the products and are statements

9    disseminated by Defendants to Plaintiff and the Class that were intended to reach

10    members of the Class.  Defendants knew, or in the exercise of reasonable care should have

11    known, that these statements were misleading and deceptive as set forth herein.

12    198.      In furtherance of its plan and scheme, Defendants prepared and distributed within

13    California and nationwide via product packaging and labeling statements that

14    misleadingly and deceptively represented the composition and the nature of the products.

15    Plaintiff and the Class necessarily and reasonably relied on Defendants' materials, and

16    were the intended targets of such representations.

17    199.      Defendants' conduct in disseminating misleading and deceptive statements in

18    California and nationwide to Plaintiff and the Class was and is likely to deceive

19    reasonable consumers by obfuscating the true composition and nature of the Purchased

20    Products in violation of the "misleading prong" of California Business and Professions

21    Code § 17500, *et seq.*

22    200.      As a result of Defendants' violations of the "misleading prong" of California

23    Business and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched

24    at the expense of Plaintiff and the Class. Misbranded products cannot be legally sold or

25    held and thus have no economic value and are legally worthless.  Plaintiff and the Class

26    paid a premium price for the Purchased Products.

27    201.      Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

28    entitled to an order enjoining such future conduct by Defendants, and such other orders

AMENDED CLASS ACTION COMPLAINT
CASE NO CV12-05652 (EJD)

and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for the Purchased Products by Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**Untrue Advertising**

202.    Plaintiff incorporates by reference each allegation set forth above.

203.    Plaintiff asserts this cause of action against Defendants for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

204.    Defendants sold the Purchased Products in California and throughout the United States during the Class Period.

205.    Defendants engaged in a scheme of offering the Purchased Products for sale to Plaintiff and the Class by way of product packaging and labeling.  These materials misrepresented and/or omitted the true contents and nature of the Purchased Products.  Defendants' advertisements and inducements were made in California and throughout the United States and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling were intended as inducements to purchase the Purchased Products, and are statements disseminated by Defendants to Plaintiff and the Class.  Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue.

206.    In furtherance of its plan and scheme, Defendants prepared and distributed in California and nationwide via product packaging and labeling statements that falsely advertise the composition of the Purchased Products, and falsely misrepresented the nature of those products.  Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendants' materials.

207.    Defendants' conduct in disseminating untrue advertising throughout California deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of the Purchased Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

208.    As a result of Defendants' violations of the "untrue prong" of California Business

and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and thus have no economic value and are legally worthless.  Plaintiff and the Class paid a premium price for the Purchased Products.

209.     Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for the Purchased Products by Plaintiff and the Class.

## SIXTH CAUSE OF ACTION
### Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

210.     Plaintiff incorporates by reference each allegation set forth above.

211.     This cause of action is brought pursuant to the CLRA.  This cause of action does not currently seek monetary damages and is limited solely to injunctive relief.  Plaintiff intends to amend this Complaint to seek damages in accordance with the CLRA after providing Defendants with notice pursuant to Cal. Civ. Code § 1782.

212.     At the time of any amendment seeking damages under the CLRA, Plaintiff will demonstrate that the violations of the CLRA by Defendants were willful, oppressive and fraudulent, thus supporting an award of punitive damages.

213.     Consequently, Plaintiff and the Class will be entitled to actual and punitive damages against Defendants for their violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

214.     Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

215.     Defendants sold the Purchased Products in California and throughout the United

1   States during the Class Period.

2   216.     Plaintiff and members of the Class are "consumers" as that term is defined by the

3   CLRA in Cal. Civ. Code §1761(d).

4   217.     The Purchased Products were and are "goods" within the meaning of Cal. Civ.

5   Code §1761(a).

6   218.     By engaging in the conduct set forth herein, Defendants violated and continue to

7   violate Sections 1770(a)(5) of the CLRA, because Defendants' conduct constitutes unfair

8   methods of competition and unfair or fraudulent acts or practices in that they misrepresent

9   the particular ingredients, characteristics, uses, benefits and quantities of the goods.

10   219.     By engaging in the conduct set forth herein, Defendants violated and continue to

11   violate Section 1770(a)(7) of the CLRA, because Defendants' conduct constitutes unfair

12   methods of competition and unfair or fraudulent acts or practices in that they misrepresent

13   the particular standard, quality or grade of the goods.

14   220.     By engaging in the conduct set forth herein, Defendants violated and continue to

15   violate Section 1770(a)(9) of the CLRA, because Defendants' conduct constitutes unfair

16   methods of competition and unfair or fraudulent acts or practices in that it advertises

17   goods with the intent not to sell the goods as advertised.

18   221.     By engaging in the conduct set forth herein, Defendants have violated and continue

19   to violate Section 1770(a)(16) of the CLRA, because Defendants' conduct constitutes

20   unfair methods of competition and unfair or fraudulent acts or practices in that it

21   represents that a subject of a transaction has been supplied in accordance with a previous

22   representation when it has not.

23   222.     Plaintiff requests that the Court enjoin Defendants from continuing to employ the

24   unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code §

25   1780(a)(2).  If Defendants are not restrained from engaging in these practices in the future,

26   Plaintiff and the Class will continue to suffer harm.

27

28

**SEVENTH CAUSE OF ACTION**
**(Breach Of Implied Warranty Of Merchantability)**

223.     Plaintiff repeats and re-alleges each of the above allegations as if fully set forth herein.

224.     Implied in the purchase of Misbranded Food Products by Plaintiff and the Class is the warranty that the purchased products are legal and can be lawfully resold.

225.     Defendant knowingly and intentionally misbranded its Misbranded Food Products.

226.     Defendant knew those Misbranded Food Products were illegal.

227.     When Defendant sold those products it impliedly warranted that the products were legal and could be lawfully resold.

228.     Plaintiff would not have knowingly purchased products that were illegal and unsellable.

229.     No reasonable consumer would knowingly purchase products that are illegal and unsellable.

230.     The purchased Misbranded Food Products were unfit for the ordinary purpose for which Plaintiff and the Class purchased them.

231.     In fact, these Misbranded Food Products were illegal, misbranded, and economically worthless.

232.     As a result, Plaintiff and the Class were injured through their purchase of an unsuitable, useless, illegal, and unsellable product.

233.     By reason of the foregoing, Plaintiff and the Class were damaged in the amount they paid for Misbranded Food Products.

**EIGHTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

234.     Plaintiff repeats and re-alleges each of the above allegations as if fully set forth herein.

235.     In making representations of fact to Plaintiff and the other Class members about its Misbranded Food Products, Defendants failed to fulfill its duty to disclose the material facts alleged above. Such failure to disclose on the part of Defendants amounts to negligent misrepresentation.

236.    Plaintiff and the other Class members, as a direct and proximate cause of

Defendants' negligent misrepresentations, reasonably relied upon such misrepresentations

to their detriment. By reason thereof, Plaintiff and the other Class members have suffered

damages in an amount to be proved at trial.

## XII.    JURY DEMAND

Plaintiff hereby demands a trial by jury of his claims.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on

behalf of the general public, prays for judgment against Defendants as follows:

A.    For an order certifying this case as a class action and appointing Plaintiff and his

counsel to represent the Class;

B.    For an order awarding, as appropriate, damages, restitution or disgorgement to

Plaintiff and the Class for all causes of action other than the CLRA, as Plaintiff does not seek

monetary relief under the CLRA, but intends to amend his Complaint to seek such relief;

C.    For an order requiring Defendants to immediately cease and desist from selling the

Purchased Products in violation of law; enjoining Defendants from continuing to market,

advertise, distribute, and sell these products in the unlawful manner described herein; and

ordering Defendants to engage in corrective action;

D.    For all equitable remedies available pursuant to Cal. Civ. Code § 1780;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding punitive damages;

G.    For an order awarding pre-and post-judgment interest; and

H.    For an order providing such further relief as this Court deems proper.

1   Dated:  April 14, 2014.                  Respectfully submitted,

2                                             /s/ Michael Hamilton
                                             _____
                                             Michael Hamilton
3                                            PROVOST UMPHREY LAW FIRM, LLP
                                             4205 Hillsboro Pike
4                                            Suite 303
                                             Nashville, TN 37215
5                                            Telephone:  (615) 297-1932
                                             mhamilton@pulf.com
6

7                                            *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28